## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 21-CR-60078-RAR

**UNITED STATES OF AMERICA**

**vs.**

**LOUIS CHARLES YOUNGLOVE,**

**Defendant.**

_____/

### REPORT AND RECOMMENDATION

THIS CAUSE comes before the Court on Defendant Louis Charles Younglove's Motion to Suppress Physical Evidence and Statements ("Motion") [DE 21], which has been referred to me by the Honorable Rodolfo A. Ruiz, II.    [DE 22].    The Motion seeks to suppress physical evidence seized from the Defendant's automobile and home on February 4, 2021, as well as statements made to Broward Sheriff's Office deputies the same day.    I have reviewed the Motion and the Government's Response.    [DE 26].[1]    On December 9, 2021, I held an evidentiary hearing at which the parties presented testimony, evidence, and arguments on the Motion.    Being fully advised in the premises, I respectfully **RECOMMEND** that the Motion be **DENIED**.

### I.    FINDINGS OF FACT

Based on the testimony and evidence presented at the evidentiary hearing on December 9, 2021, I make the following findings of fact.    The evidence presented consisted of the testimony of Broward Sheriff's Office (BSO) Detectives Jeffrey Bates, Robert Nacarato, and Kevin Vieira, a video recording from aerial surveillance on February 4, 2021 (Ex. D-1), video and audio recordings from "body cameras" worn by various officers during the incident at issue (Ex. D-2

---

[1] The Defendant did not file a Reply.

through D-11), and a search warrant application for the Defendant's residence (Ex. G-1).   I have considered all of this testimony and evidence in making the below findings of fact and credibility determinations.

    A.  Initial Investigation

In May 2020, Detective Bates began an investigation into the Defendant for suspected narcotics trafficking.   In that month, Detective Bates (the lead detective on the investigation) began conducting surveillance of the Defendant and his daily travels.   From this surveillance, he determined that the Defendant lived at a residence in Oakland Park, Florida ("the Residence") and operated a restaurant, Chi-Town, serving Chicago-style fast food, on McNab Road in Pompano Beach, Florida.   The investigation determined that the business was owned in someone else's name but that it was operated by the Defendant's family.   The Defendant worked there with his family in the capacity of manager or owner.   Detective Bates surveilled the Defendant between May 2020 and February 4, 2021.   From that surveillance, Detective Bates observed the Defendant's daily routine.   The Defendant would leave the Residence between 9:15 and 10:00 a.m. in a white pickup truck.   Prior to leaving, the Defendant would carry a large black duffel bag out of his residence and place it in the left rear driver's side seat of his truck.   Upon arriving at Chi-Town, the Defendant would typically park in a handicapped parking spot directly in front of the business, remove the black duffel bag from the rear passenger seat of the truck, and bring it into Chi-Town.

Through his surveillance over several months, Detective Bates observed the Defendant conduct what appeared to be numerous hand-to-hand transactions.   While Detective Bates observed some patrons of Chi-Town who appeared to be "legitimate customers" (based on the time they spent in the restaurant or the fact that they exited carrying food or beverages), he also

observed numerous other customers who entered the business for only a short period, met briefly with the Defendant, and left without food or drinks.   Detective Bates suspected that these latter customers were actually engaging in narcotics transactions with the Defendant.   The Detective also observed the Defendant conduct what Detective Bates believed were hand-to-hand transactions from the Defendant's white truck in the parking lot in front of Chi-Town.   He saw the Defendant sitting in his truck as individuals met the Defendant at his driver's window, conducted a transaction within less than a minute, and left.   Detective Bates also observed that the Defendant always had the large black duffel bag within the cab of his truck during these suspected hand-to-hand transactions.

In a few instances, investigating agents stopped individuals who were seen engaging in suspected hand-to-hand transaction with the Defendant at his vehicle.   A surveillance team watched these individuals as they left the area around Chi-Town and conducted a traffic stop before the individuals could stop anywhere else or meet within anyone else.   From these stops, investigators recovered various types of narcotics, including prescription pills, cannabis, and, in one instance, either heroin or cocaine.   At least one of these individuals identified the source of the narcotics as "Louie" who "owns a Chicago-style restaurant."   After conducting suspected hand-to-hand transactions in his truck, the Defendant would eventually either enter Chi-Town carrying the black duffel bag or drive straight back to his residence and bring the black duffel bag inside.

In January 2021, the investigation used a confidential informant[2] (CI) to make two controlled purchases of narcotics from the Defendant at Chi-Town.   Detective Bates testified that the CIs have proven to be reliable.   In each instance, the CI was searched prior to the purchase to

---

[2] It is unclear from the testimony whether one CI made two separate controlled purchases or two different CIs made one controlled purchase each.

ensure he had no narcotics on him and was provided with official funds.   In each instance, the CI

went to Chi-Town, met with the Defendant, and purchased approximately 1 gram of cocaine.

After each purchase, the CI identified the Defendant as the person who sold the cocaine and

indicated that the Defendant retrieved the cocaine from a duffel bag in the kitchen area of Chi-

Town.

During their investigation, Detective Bates and other officers learned of the Defendant's

criminal history.   This criminal history included a federal conviction for manufacturing marijuana

and state convictions for trafficking in marijuana and cocaine.

B.   February 4, 2021 Stop and Search of Vehicle

Based on the above-described investigation, investigators obtained a state search warrant

to search Chi-Town for evidence of narcotics violations.   They planned to execute the warrant on

February 4, 2021.   On that morning, investigators set up surveillance at the Defendant's residence,

consisting of both stationary and mobile ground surveillance and aerial surveillance by a manned

airplane.   At approximately 10:19 a.m., the surveillance observed (as confirmed by the aerial

video) the Defendant exit the Residence carrying a black duffel bag and place it in the rear, driver's

side seat of his truck.   Ex. D-1 at 12:00.[3]   Both the Defendant and his adult son, Adam, entered

the vehicle (the Defendant driving and Adam in the back seat), and they left the residence at

approximately 10:26 a.m.

Surveilling agents (in unmarked vehicles) followed the Defendant.   Shortly after leaving

his Residence, the Defendant failed to make a full stop at a stop sign at an intersection with

Andrews Avenue.   *Id.* at 19:33.   Along his usual route to Chi-Town, the Defendant stopped in

the driveway of an unoccupied residence.   *Id*. at 20:08.   There, an individual from the adjacent

---

[3] This citation and subsequent citations refer to the minute mark (here, the twelve minute mark) of the aerial
surveillance video, Ex. D-1.   The time of day is displayed on the video.

residence met the Defendant for less than five seconds at the Defendant's driver window and conducted what appeared to be a hand-to-hand exchange. *Id*. at 20:54-20:58. The Defendant then continued on his way to Chi-Town. Along the way, he failed to completely stop at a red light while turning right onto Cypress Creek Road. *Id*. at 22:16. According to Detective Bates, the surveilling officers did not immediately effectuate a traffic stop based on the two traffic infractions because they feared the Defendant would flee and endanger officers and others; believing the Defendant was heading to Chi-Town, the investigators decided to stop him there.

At approximately 10:35 a.m., the Defendant's vehicle entered the parking lot in front of Chi-Town from McNab Road. An unmarked SUV, driven by BSO Detective Vieira and containing BSO Detective Nacarato and two other officers, entered the parking lot approximately 1-2 car-lengths behind the Defendant. Rather than pulling into his typical parking spot (directly in front of Chi-Town to the Defendant's right), the Defendant turned left and drove slowly through the parking lot until he was again facing McNab Road at another exit from the parking lot. Detective Bates (through his previous surveillance) had never seen the Defendant do this before. The Defendant's vehicle stopped at the parking lot exit for approximately 8-10 seconds before Detective Vieira's vehicle slowly came up behind him. *Id*. at 28:24-28:32.

Based on the routine Detective Bates had previously observed, Detective Vieira had expected the Defendant to park in his usual parking spot. Detective Vieira had planned on waiting until the Defendant had parked and left his vehicle with the black duffel bag before making contact with the Defendant and executing the search warrant on Chi-Town. When the Defendant instead turned away from his parking spot and headed toward an exit, Detective Vieira initiated a traffic stop, activating his emergency lights and pulling up close behind the Defendant. *Id*. at 28:39. At approximately the same time that Detective Vieira activated his emergency lights, Detective Bates,

driving another unmarked SUV, drove perpendicularly in front of the Defendant's vehicle, partially blocking the Defendant from exiting the parking lot.  *Id*.  The Defendant tried to turn left past the rear of Detective Bates's vehicle and, in doing so, grazed the side of that vehicle.  *Id*. at 28:42.  An officer in Detective Bates's passenger seat exited his vehicle with his gun drawn, as the Defendant quickly reversed his vehicle for a few feet before quickly stopping.  *Id*. at 28:44-28:48.  Detectives Vieira and Nacarato, and the other two officers in the vehicle behind the Defendant's, exited their vehicle with their weapons drawn, while another unmarked vehicle came from the east to further block the Defendant's vehicle.  A few seconds later, a fourth vehicle came in from the west, such that the Defendant's vehicle was blocked on all sides.

In total, approximately seven or eight officers confronted the vehicle with their weapons drawn.  The Defendant opened his driver's side door.  The officers loudly ordered both the Defendant and his son out of their vehicle, and the Defendant climbed out of the truck under his own power.  Ex. D-8 at 00:34-00:40.  Detective Nacarato immediately placed the Defendant in handcuffs and brought the Defendant approximately ten yards away from the vehicle.  *Id*. at 00:40-01:00.  Based on the various video exhibits, all of the officers quickly re-holstered their weapons.  Detective Nacarato remained standing with the Defendant, although other officers came near at times.  The Defendant's son was removed from the passenger side of the vehicle, and both doors to the vehicle remained open.  Detective Bates observed the black duffel bag in the back seat.

Within a minute of the Defendant being ordered out of the vehicle, officers observed the smell of marijuana emanating from the vehicle.  I find the testimony about this observation credible because one of the body camera exhibits shows one officer explicitly noting this observation while standing on the passenger side of the vehicle, stating "the car reeks of f---ing

weed."   Ex D-9 at 0:58.   The officer next to him immediately agreed, "Oh yeah, I smell it."   *Id.* at 1:00.   The tone of the statements, and the surrounding circumstances of the chaotic traffic stop scene, indicate that they were genuine observations, not fabrications.   Furthermore, cannabis was in fact subsequently found in the vehicle, along with other controlled substances.

Within approximately 10 minutes of the traffic stop,[4] BSO Detective Eramo deployed a K-9 trained in narcotics detection around the Defendant's vehicle.   Ex. D-10.   The K-9 was already present on scene around the time of the traffic stop.   The K-9 sniffed around the outside of the vehicle and ultimately jumped into the backseat and sat on the black duffel bag.   *Id.* at 00:30-1:23.   Detective Eramo reported that the K-9 had "alerted" to the presence of narcotics.   It is unclear from the video and testimony whether the K-9 "alerted" when sniffing around the outside of the vehicle or only once he had entered the vehicle.[5]   Following the K-9 alert, Detective Bates searched the black duffel bag and discovered various controlled substances, including cocaine, marijuana, and prescription pills, as well as more than $18,000 in cash.   Following this search, the officers placed the Defendant under arrest, approximately 15 minutes after the stop of the Defendant's vehicle.

C.   Defendant's Post-Arrest Statement

Following the Defendant's arrest, the detectives brought the Defendant inside Chi-Town, where he was seated on a chair or a stool.   Detective Bates sought to interview the Defendant, with Detective Nacarato sitting or standing next to him.   The Defendant remained handcuffed behind his back, although he was not cuffed to the chair.   According to both Detective Bates and

---

[4] Each body camera recording shows a timestamp in "Zulu" time.   The time is consistent across all body cameras. Based on these recordings, the stop occurred at approximately 15:35 "Zulu" time, and the K-9 was deployed at 15:45.
[5] At one point, Detective Eramo praised the K-9 by saying "good boy" when the K-9 was at the driver's side rear bumper.   Ex. D-10 at 00:58.   Detective Bates (who has some experience with K-9s but no formal training) thought this praise may have indicated an alert but could not be certain.   It is more certain that the K-9 alerted when he sat on the duffel bag inside the vehicle and received a red ball as an award.   *Id.* at 01:28.

Detective Nacarato, Detective Bates read the Defendant his *Miranda*[6] rights from a BSO-issued card.   Detective Bates asked the Defendant to acknowledge each of his rights as he read them, and the Defendant did acknowledge each one.   After Detective Bates finished reading the card, the Defendant waived his rights and agreed to speak with the detectives.

When asked, the Defendant acknowledged knowing why the detectives were there and emphasized that his son had "nothing to do with it."   Detective Bates advised that he would be obtaining a search warrant for the Residence and asked the Defendant whether they would find anything there.   The Defendant acknowledged that there might be some "stuff," later specifying cocaine.   Detective Bates asked where in the house the "stuff" was located, so that they would not have to "destroy the house" while executing the search warrant.   The Defendant said it was in the master bedroom closet.

There is no recording of Detective Bates reading the Defendant his *Miranda* rights, nor of the Defendant's subsequent statements.   Detective Bates testified that his BSO unit does not have body cameras, so he did not use one to record the interview.   He also did not have the Defendant sign a written waiver because he did not believe it was necessary given the oral advisement. Detective Nacarato did have a body camera (and, in fact, had activated his body camera during the stop and while standing with the Defendant, deactivating it once he had brought the Defendant to the sit outside Chi-Town).   However, Detective Nacarato did not record the *Miranda* warnings or the interview either.   He explained that he had deactivated his camera once the scene was secure. He further explained that recording is discretionary and that he was there only to provide assistance, not as the lead investigator.   Finally, he explained that he would not have activated his

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

body camera during the interview because there were undercover officers also present and there is a policy against recording when undercover officers are present.

D. Residence Search

Later on February 4, Detective Bates applied for a search warrant for the Residence, which was issued by a state judge. The search warrant application recounted the details of the investigation from May 2020 through February 4, 2021, including Detective Bates's observations of the Defendant's routine of carrying his black duffel bag to and from the Residence, the observed suspected hand-to-hand transactions from the Defendant's truck, the recovery of controlled substances from individuals observed making hand-to-hand transactions with the Defendant, the controlled purchases using a CI, and the CI's identification of the Defendant (and the duffel bag) as the source of the purchased narcotics. Ex. G-1. The application also recounted the events of February 4, including the odor of marijuana from the Defendant's truck, the K-9 alert, a list of 11 forms of controlled substances recovered from the vehicle, and the Defendant's statement that "he has additional cocaine and 'Stuff'" at the Residence, within his bedroom closet. *Id*. Although not described in testimony at the hearing, the Motion and Response both note that officers executing the search warrant on the Residence found various forms of controlled substances, large sums of cash, digital scales, and personal identifications.

## II. **ANALYSIS**

The Motion seeks to suppress the evidence seized from the Defendant's vehicle and the Residence, as well his statements to Detectives Bates and Nacarato. The Motion raises three[7]

---

[7] The Motion raised a fourth issue – arguing that the use of "drone video surveillance" exceeded the scope of the state warrant issued for the search of Chi-Town and that any such video should be suppressed. At the hearing, the Defendant withdrew this argument, acknowledging that the evidence established that law enforcement had not used a drone to conduct aerial surveillance. Since the Defendant has withdrawn this argument, that portion of his Motion is moot and is not discussed further.

primary arguments: (1) the detention of the Defendant constituted an arrest for which the Detectives lacked probable cause; (2) the Defendant's post-arrest statements were rendered involuntary by the illegal arrest and a failure to provide *Miranda* warnings; and (3) inclusion of the Defendant's post-arrest statements tainted the affidavit in support of the search warrant for the Residence, which would have lacked probable cause otherwise.   The Defendant's arguments fail on each issue.

A. <u>Seizure of the Defendant and Search of his Vehicle</u>

Fourth Amendment law distinguishes between two different levels of seizures that curtail an individual's freedom of movement: arrests, which require probable cause, and investigatory stops, which only require reasonable suspicion to believe criminal activity is afoot.   *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Sharpe*, 470 U.S. 675 (1985).   The Defendant argues that the stop of his vehicle (by blocking it in) and the officers' actions (ordering him out of his vehicle with weapons drawn, placing him in handcuffs, and moving him away from his vehicle) amounted to an arrest for which the officers lacked probable cause.   However, I find that law enforcement already had probable cause to arrest the Defendant when they stopped him, based on their prior investigation.   To the extent that they lacked probable cause, the stop of the Defendant's vehicle, and the detention of the Defendant himself, fell within the parameters of a reasonable investigative stop supported by reasonable suspicion, rather than a full-blown arrest requiring probable cause.

The officers had probable cause to arrest the Defendant on February 4, 2021.   Specifically, there was probable cause to believe that the Defendant had sold cocaine in the few weeks preceding the arrest based on the controlled purchases by the confidential informant(s).   "Probable cause to arrest exists when the totality of the facts and circumstances support a reasonable belief that the

suspect had committed or was committing a crime." *United States v. Mancilla-Ibarra*, 947 F.3d 1343, 1349 (11th Cir. 2020) (quoting *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007)).   "[I]n making a warrantless arrest an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 242 (1983)).

At the hearing, the Defendant argued that the evidence regarding the Defendant's drug sales was too unreliable to amount to probable cause, specifically noting the lack of video evidence of the sales.   However, the evidence included not only identification by a CI of the Defendant selling cocaine (from his black duffel bag) on two separate occasions but also the corroborating evidence from the previous several months of surveillance and investigation.   That investigation included detectives observing multiple people conduct hand-to-hand transactions with the Defendant in his car, immediately after which some of those people were found to have controlled substances.   At least one of those people also identified the Defendant (at least by first name and by describing him as the "owner of a Chicago-style restaurant") as the seller of the controlled substances.   Notably, this evidence amounted to sufficient probable cause to support issuance of a search warrant for the premises of Chi-Town.   While the sale of narcotics by an unknown individual from Chi-Town alone would not amount to probable cause to arrest the Defendant himself, the identification of the Defendant by the purchasing CI and one of the stopped purchasers, along with the detectives' surveillance of the Defendant, created a reasonable probability that the Defendant had committed the offense.   *See Gates*, 462 U.S. at 231 ("In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable

and prudent men, not legal technicians, act." (internal citation omitted)).   Although the Detectives

could have (and did not) obtain an arrest warrant along with the search warrant for Chi-Town, an

arrest warrant is not required to make a felony arrest in a public place, as long as the officers have

probable cause to believe that a felony has occurred.[8]   *United States v. Watson*, 423 U.S. 411,

417-423 (1976); *United States v. Black*, 801 F. App'x 695, 697 (11th Cir. 2020) (denying motion

to suppress an arrest made based, in part, on a "probable cause pickup order" entered by another

officer six days earlier).[9]

Even if the Detectives did not have probable cause to arrest the Defendant, their stop and

detention of the Defendant was supported by reasonable suspicion and fell within the parameters

of a valid investigatory stop.   Officers may approach and stop a person for the purpose of

investigating possible criminal behavior based on reasonable suspicion.   *Terry*, 392 U.S. at 27.

Reasonable suspicion requires that the detaining officer have "a particularized and objective basis"

for suspecting legal wrongdoing based on the "totality of the circumstances."   *United States v.*

*Arvizu*, 534 U.S. 266, 273 (2002).   "Reasonable suspicion demands 'considerably less' than

probable cause, but 'the police are required to articulate some minimal, objective justification for

the stop.'"   *United States v. Webster*, 314 F. App'x 226, 229 (11th Cir. 2008) (quoting *United*

*States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996)).

---

[8] The sale of cocaine, even in small amounts, is a felony offense under both state and federal law.   *See* 21 U.S.C. § 841(a); § 893.13, Fla. Stat.

[9] It is also irrelevant whether the Detectives here believed they were arresting the Defendant for his prior drug distribution based on probable cause, stopping him based on reasonable suspicion that he was carrying narcotics, or stopping him based on probable cause to believe he had committed traffic infractions.   Fourth Amendment analysis proceeds based on an objective review of the facts, rather than the subjective views or motivations of the officers involved.   *See Whren v. United States*, 517 U.S. 806, 812 (1996).   *See also Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) ("Probable cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been." (citing*, inter alia*, *Whren*, *supra*, and *Ornelas v. United States,* 517 U.S. 690 (1996))).

*Terry* established a two-step inquiry for evaluating the reasonableness of an investigative stop.

> Under *Terry*'s two-part inquiry, we first examine "'whether the officer's action was justified at its inception,'" *Powell*, 222 F.3d at 917 (quoting *Terry*, 392 U.S. at 20, 88 S. Ct. at 1879), which turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime, *id.*  In the second part of the inquiry, determining whether the stop went too far and matured into arrest before there was probable cause, we consider "'whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry*, 392 U.S. at 20, 88 S. Ct. at 1879).

*United States v. Acosta*, 363 F.3d 1141, 1144-45 (11th Cir. 2004).

As to the first step, there is little question that the detectives had reasonable suspicion to believe that the Defendant was engaged in criminal activity at the inception of the stop.   For the reasons articulated above, through its months-long investigation law enforcement had developed a reasonable, and articulable, belief that the Defendant was engaged in the sale of narcotics. Importantly, the investigation had identified the Defendant's black duffel bag as a likely storage container for narcotics.   That conclusion was based on reports from both CI transactions that the Defendant retrieved the sold narcotics from that bag, as well as surveillance observations that the Defendant carried the black duffel bag daily between his Residence and Chi-Town and had the bag with him in his truck during suspected hand-to-hand transactions.   Surveillance had also seen the Defendant place the black duffel bag in his truck that morning and observed him engage in a potential hand-to-hand transaction on his way to Chi-Town.   Thus, there was reasonable suspicion to initiate a traffic stop to investigate whether the truck contained controlled substances.   Indeed, at the hearing, the Defendant essentially conceded as much, focusing instead on the second step in the *Terry* inquiry.

In the second part of the *Terry* inquiry, determining whether the stop exceeded the reasonable scope justified by the circumstances and matured into a full-blown arrest without

probable cause, the Court considers four non-exclusive factors: (1) the law enforcement purposes served by the detention; (2) the diligence with which the police pursue the investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention.   *Acosta*, 363 F.3d at 1146 (internal citations omitted).   On balance, these factors weigh in favor of the Government.

"In analyzing the first factor, the law enforcement purposes served by the detention . . . the most important [consideration] is whether the police detained [the defendant] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference." *Id*.   Here the detectives did pursue a method of investigation likely to confirm or dispel their suspicions that the Defendant's vehicle contained narcotics by bringing a drug detection K-9 to sniff around the vehicle.   Related to the second factor, they pursued this investigation diligently by having the K-9 on the scene where they stopped the vehicle and deploying the K-9 within 10 minutes of the stop.   As discussed below (*see infra* note 10), the detectives actually had probable cause to search the vehicle within a minute of the stop when they detected the strong odor of marijuana, but they were reasonable in bringing the K-9 to confirm their observations.   In any event, the detectives diligently conducted a search of the vehicle (supported by probable cause) and confirmed their suspicions by discovering narcotics in the black duffel bag, within 15 minutes of the stop.   *See United States v. Mendoza*, 658 F. App'x 479, 483-84 (11th Cir. 2016) (use of on-scene K-9 within 10 minutes of stop was diligent pursuit of method of investigation likely to confirm or dispel suspicions of drug trafficking).   Similarly, the fourth factor also weighs in favor of the Government, as the Defendant's detention lasted only 15 minutes before he was formally arrested.   *See Acosta*, 363 F.3d at 1147-48 (finding detention of 20-30 minutes did not convert *Terry* stop into a full-blown arrest); *United States v. Gil*, 204 F.3d 1347,

1351 (11th Cir. 2000) (finding detention of suspect for 75 minutes, while in handcuffs in police vehicle, reasonable).

The third factor – the scope and intrusiveness of the detention – is a closer question and the issue on which the Defendant focuses.   The detention here certainly included intrusive elements often associated with a full-blown arrest.   Specifically, the Defendant's vehicle was boxed in, and he was ordered out of his vehicle while surrounded by multiple officers with weapons drawn (although those weapons were quickly reholstered).   The Defendant was placed in handcuffs, and he was eventually patted down.   However, the question is not whether intrusive measures were used.   Indeed, the Eleventh Circuit has recognized that

> an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon, *United States v. Roper*, 702 F.2d 984, 987-988 (11th Cir. 1983), handcuffs a suspect, *United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989), orders a suspect to lie face down on the ground, *Courson v. McMillian*, 939 F.2d 1479, 1492-93 (11th Cir. 1991), or secures a suspect in the back of a patrol car, *Gil*, 204 F.3d at 1351.

*Acosta*, 363 F.3d at 1147.   Nor does restricting a defendant's movement, including by blocking his car from moving, turn an investigative stop into a *de facto* arrest.   *Id.* (citing *Hastamorir*, 881 F.2d at 1556).   Rather, the Court must ask whether the officers took "reasonable steps to ensure their safety" based on possessing "an articulable and objectively reasonable belief that the suspect is potentially dangerous."   *Michigan v. Long*, 463 U.S. 1032, 1051 (1983); *Acosta*, 363 F.3d at 1146.

Here, the detectives had an articulable reasonable basis for believing that the Defendant may pose a danger.   For the reasons described above, the officers had a reasonable belief that the Defendant had been engaged in narcotics dealing over the course of several months, that he was carrying narcotics for distribution in the duffel bag in his vehicle, and that he had a criminal history including multiple convictions for controlled substance trafficking.   While they had no specific

basis for believing that this Defendant had a firearm, all three officers testified to having a concern that he may have been armed, based on their experience that those dealing in narcotics often carry firearms to protect either their product or the cash that it generates.

The officers' concerns were heightened based on what they reasonably interpreted as the Defendant's attempt to flee from the traffic stop.   The Defendant had already bypassed his normal parking spot and headed toward the exit of the parking lot he had just entered.   This action gave the officers some reason to believe the Defendant was aware of their presence and wished to avoid them.   After Detective Vieira turned on his emergency lights and Detective Bates attempted to block the Defendant from turning onto McNab Road, the Defendant turned his truck to try to get around Detective Bates's vehicle, grazing it in the process.   Notably, the turn the Defendant was attempting would have put his vehicle facing west in the eastbound lane of a busy road.   The Defendant's turn was not "aggressive" or at high speed, and it did not evince a specific intent to cause the officers (or anyone else) harm.   However, as Detective Nacarato credibly testified, once the Defendant's vehicle made contact with Detective Bates's vehicle, in the officers' minds the stop went from a routine stop to a "high risk stop."

Whether the Defendant was, in fact, intentionally fleeing law enforcement or not is far from certain.   As defense counsel suggested, the Defendant may not have clearly seen Detective Vieira's emergency lights, and the Defendant's turn into Detective Bates's vehicle was neither at a high speed nor aggressive.   Indeed, the entire incident happened so quickly that the Defendant may have been acting instinctually without much thought.   But the question is whether these actions – in combination with what the officers already knew about the Defendant – gave the officers reasonable concerns for their safety and a reasonable basis for taking the steps they took to secure the Defendant.   They did.

In reaching this conclusion, the Eleventh Circuit's decisions in *Acosta* and *Mendoza* are instructive.   In *Acosta*, officers, based on surveillance, suspected the defendant of being the person who was to deliver $300,000 to an undercover officer believing it would be laundered.   363 F.3d at 1142-43.   Seeing Acosta remove a bag the officers believed contained the money from an apartment and into his vehicle, the officers (like the detectives here) blocked his vehicle in a parking lot and confronted him with five or six officers.   *Id*. at 1143.   At least one officer had his gun drawn, but all of the officers holstered their weapons within ten seconds.   *Id*.   The officers detained (but did not arrest) Acosta, patted him down, and held his driver's license, while they obtained consent to search his car, apartment, and a subsequently discovered duffel bag, all of which took approximately 20-30 minutes.   *Id*. at 1143, 1148.   The Eleventh Circuit found the scope of the detention reasonable, including the blocking of Acosta's vehicle, drawing weapons, frisking, and keeping Acosta from his vehicle, based on the supposition that one carrying a large amount of money in his car may have had a weapon to protect himself and the money.   *Id*. at 1147.   That supposition was similar to the one here – that a person suspected of narcotics trafficking may have possessed a weapon on his person or in his vehicle for protection.

In *Mendoza*, the defendant argued, much as the Defendant does here, that his investigative stop became an arrest because agents "blocked his vehicle, ordered him out, handcuffed him, and patted him down."   658 F. App'x at 483.   There the agents had arrested Mendoza's co-conspirator carrying methamphetamine and a firearm.   They had the co-conspirator arrange a delivery of additional drugs and believed Mendoza to be the courier based on observing his vehicle in concert with text messages to and from the courier.   *Id*. at 481.   The agents blocked Mendoza's car into a parking space, ordered him and a passenger out of the vehicle, handcuffed them, and patted them down.   After being denied consent to search the vehicle, the agents brought a K-9,

whom they already had on scene, to sniff around the vehicle. *Id*. After a positive alert from the K-9, they search the vehicle and found methamphetamine, approximately 10 minutes after the stop began. *Id*. at 481-82. The Eleventh Circuit found the agents' decision to handcuff Mendoza and his passenger reasonable for officer safety concerns, based on the belief that someone transporting large amounts of drugs could potentially be armed, as well as the knowledge that their co-conspirator had been armed. *Id*. at 484. Although the armed co-conspirator is a factor present in *Mendoza* that is absent here, the officers had additional grounds for concern here – specifically knowledge of the Defendant's criminal history and what they reasonably viewed as evasive actions. In short, like the Eleventh Circuit in *Mendoza*, I "cannot say that the agents' actions exceeded what was reasonably necessary to ensure their safety." *See id*. Therefore, I find that the Defendant's detention was not a *de facto* arrest.[10]

### B. Defendant's Post-Arrest Statements

The Defendant next argues that his statements to Detective Bates must be suppressed because they were the product of an illegal arrest and were obtained without required *Miranda* warnings. In-custody statements made following an illegal arrest must be suppressed unless "intervening events break the causal connection between the illegal arrest and the confession" in

---

[10] Because the Defendant's detention did not exceed the bounds of an investigatory stop, and was supported by probable cause in any event, there are no grounds to suppress the evidence found in the Defendant's vehicle. However, even if the Defendant were correct that the means of his detention was "overly intrusive," it does not necessarily follow that the physical evidence found in the vehicle is fruit of this poisonous arrest. The Defendant essentially concedes that there was reasonable suspicion to stop his vehicle at the outset. Within a minute of that stop, the Detectives had probable cause to search the vehicle based on the odor of marijuana (in addition to what they already knew). *See California v. Acevedo*, 500 U.S. 565, 580 (1991) ("[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."); *United States v. Cheeks*, 795 F. App'x 805, 811-12 (11th Cir. 2019) ("Our precedent makes clear that an officer's level of suspicion rises to the level of probable cause when he detects 'what he [knows] from his law enforcement experience to be the odor of marijuana.'" (quoting *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991))). Therefore, unlike a situation where officers search a detained person's body, seek consent, or elicit statements that lead to discovery of evidence, whether the officers placed the Defendant in handcuffs or held weapons in ordering him out of his vehicle (the most intrusive aspects of his detention) bear little causal connection to the discovery of the evidence he seeks to suppress here.

order to ensure that the confession is sufficiently voluntary. *Taylor v. Alabama*, 457 U.S. 687, 689-90 (1982). However, having found above that the Defendant's arrest was not illegal, I cannot find that suppression is warranted on that basis. As for *Miranda* warnings, I find that Detective Bates administered, and the Defendant voluntarily waived, his *Miranda* rights.

The Defendant urges the Court to find that Detective Bates did not actually advise the Defendant of his *Miranda* rights because the advisement and waiver were not recorded by audio or video and were not otherwise memorialized in writing. However, having had the opportunity to observe Detective Bates's and Detective Nacarato's testimony, I find their testimony credible. Their testimony regarding the advisement of rights and the Defendant's statements was clear and consistent with each other. Moreover, Detective Nacarato's explanation that he deactivated his body camera once the scene was secure is consistent with the body camera recordings of the other officers submitted into evidence. Furthermore, the Defendant did not present any countervailing testimony from which the Court could find that Detective Bates did not advise the Defendant of his rights. While having a recording would be much preferable, considering all of the circumstances here I cannot find that the lack of recording alone is sufficient to undermine the Detectives' credibility. Therefore, I conclude that Detective Bates did advise the Defendant of his *Miranda* rights, that the Defendant voluntarily waived those rights, and that there are no grounds upon which to suppress the Defendant's post-arrest statements.

C. Search of Residence

Finally, the Defendant argues that the evidence seized from his Residence pursuant to a state search warrant should be suppressed because the affidavit in support of that warrant relied upon his unlawfully-obtained post-arrest statements and was otherwise lacking in probable

cause.[11]   Having found that the Defendant's post-arrest statements were validly obtained, I do not find any taint to the search warrant affidavit.   However, even assuming the Defendant's post-arrest statement should be suppressed, I find no basis for invalidating the search warrant and suppressing the fruits of the search.

When officers obtain a warrant by including unlawfully-obtained evidence in their affidavit, courts follow a two-part test to determine whether the evidence seized pursuant to that warrant should be suppressed.   *United States v. Albury*, 782 F.3d 1285, 1291 (11th Cir. 2015). First the court must excise the unlawfully-gained information and determine whether the remaining information in the affidavit nevertheless supports a finding of probable cause.   *Id*. "Probable cause exists when under the 'totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"   *Id*. (quoting *Gates*, 462 U.S. at 238).   Second, if the remaining information supports probable cause, the court evaluates whether the officers' decision to seek the warrant was prompted by the unlawfully-obtained evidence.   *Id*.

Here, Detective Bates's search warrant affidavit contained a single brief statement from the Defendant's post-arrest statement: that the Defendant had "admitted that he has additional cocaine and 'Stuff' at his listed residence, within his bedroom closet."   Ex. G-1 at 24.   Even after excising that statement from the affidavit, the affidavit sufficiently establishes probable cause for the search of the Residence.   The search warrant application recounted the details of the investigation from May 2020 through February 4, 2021, including Detective Bates's observations of the Defendant's routine of carrying his black duffel bag to and from the Residence, the observed

---

[11] The Motion contains argument in this section regarding the voluntariness of consent to search.   The Government has not argued that the Defendant consented to the search of the Residence; indeed, Detective Bates testified that he did not ask the Defendant for consent.   Therefore, I focus only on the validity of the search warrant.

suspected hand-to-hand transactions from the Defendant's truck, the presence of the black duffel bag in the truck during those transactions, the recovery of controlled substances from individuals observed making hand-to-hand transactions with the Defendant, the controlled purchases using a CI, and the CI's identification of the Defendant (and the duffel bag) as the source of the purchased narcotics.   Ex G-1 at 17-22.   In short, the affidavit established probable cause to believe that the Defendant was selling controlled substances, that he kept those controlled substances in his black duffel bag, and that he routinely brought that bag to and from his Residence daily.   These facts established a "fair probability" that evidence or contraband would be found in the Defendant's Residence.   Furthermore, although not essential for finding probable cause, the evidence from the surveillance on February 4 and the various controlled substances subsequently found in the black duffel bag, *see* Ex. G-1 at 22-23, further cements the justification for the search warrant.

As to the second step, I find that Detective Bates was already planning on pursuing a search warrant for the Residence prior to the Defendant's post-arrest statements.   Indeed, as Detective Bates testified, he prompted the Defendant's statement by informing the Defendant that they would be obtaining a search warrant for the Residence.   Therefore, I find that the Government has satisfied both prongs of the test and that the evidence seized pursuant to the Residence search warrant is admissible.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, I respectfully RECOMMEND that the Defendant's Motion to Suppress [DE 21] be **DENIED**.

The parties will have **seven**[12] (7) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable

---

[12] At the evidentiary hearing, both parties agreed to shortening the objection period to seven days.

Rodolfo A. Ruiz, II, United States District Judge.   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary, in the interest of justice.   *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 14th day of December, 2021.

JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE